# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| v. | * | **CRIMINAL NO.** ___JKB___ - 12 - CR - 0127 |
| | * | |
| **KEVIN SNIFFEN,** | * | **(Conspiracy to Commit Wire Fraud, 18** |
| | * | **U.S.C. § 1349; Forfeiture)** |
| Defendant. | * | |
| | * | |
| | * | |

*******

## INFORMATION

## COUNT ONE

The United States Attorney for the District of Maryland charges that:

## INTRODUCTION

Unless specified otherwise, at all times relevant to this Information:

1.      Defendant **KEVIN SNIFFEN** was an attorney who was licensed to practice law in the State of Maryland.

2.      Patrick Belzner was a home builder who lived in Glen Arm, Maryland.

3.      B.M. was a home builder who lived in Baltimore, Maryland and was the registered agent and owner of several Maryland corporate entities, including, but not limited to: (a) The McCloskey Group, LLC; (b) 1100 Columbia York PA, LLC; (c) Claires Lane, LLC; and (d) Kellen Property & Investment, LLC.

4.      M.P. resided in or around Newport Beach, California. M.P. presented himself as the "Senior Underwriter" of Insurance Annuity Group Underwriters LLC and IAG Underwriters Inc., with subsidiaries Workmen's Life Insurance Company, Preferred Senior Holding, LLC, and

Teachers Annuity Group, LLC (collectively "IAG"). IAG was located at 610 Newport Center

Drive, Suite 600, Newport Beach, California 92660.

5.     G.G. was an attorney licensed in the State of California who resided in Santa Ana,

California and was in-house counsel for IAG.

## THE CONSPIRACY

### The Charge

6.     From at least August 2009, and continuing until at least in or about August 2011,

in the District of Maryland and elsewhere, the defendant,

### KEVIN SNIFFEN,

together with Patrick Belzner, B.M., and others known and unknown to the United States

Attorney, did knowingly and willfully conspire, combine, confederate, and agree to commit wire

fraud in violation of 18 U.S.C. § 1343, that is, to knowingly and willfully devise and intend to

devise a scheme and artifice to defraud lenders, investors, and those seeking to obtain

commercial loans, and to obtain money and property by means of materially false and fraudulent

pretenses, representations, and material omissions, and for the purpose of executing and

attempting to execute the scheme to defraud, did transmit and cause to be transmitted by means

of wire and radio communication in interstate commerce, writings, signs, signals, pictures, and

sounds.

### Manner and Means of the Wire Fraud Conspiracy

7.     It was a part of the conspiracy to commit wire fraud that co-conspirators Patrick

Belzner and B.M. sought investors to pay off existing debts on real estate projects and to fund

real estate development in Maryland, Pennsylvania, and elsewhere.

8.      It was further a part of the wire fraud conspiracy that co-conspirators Patrick Belzner, B.M., and others known and unknown to the United States Attorney targeted individuals seeking investment opportunities or commercial real estate development lending.  With certain investors, defendant Belzner falsely presented himself as "Patrick McCloskey."

9.      It was further a part of the wire fraud conspiracy that co-conspirator Patrick Belzner and others known and unknown to the United States Attorney instructed the victims that in order to obtain lending for commercial real estate projects, the lender or the lender's broker required a showing of "liquidity."

10.     It was further a part of the wire fraud conspiracy that co-conspirator Patrick Belzner and others known and unknown to the United States Attorney stated that these purported lenders, including IAG, required that the "liquidity" had to be funded by the victims through deposits of large sums of money into an escrow bank account.

11.     It was further a part of the wire fraud conspiracy that co-conspirators Patrick Belzner, B.M., and others known and unknown to the United States Attorney stated to victim investors that the funds IAG was attempting to underwrite or secure from third-party lenders were either for the victims' own real estate construction purposes, or to fund co-conspirators Patrick Belzner and B.M.'s construction projects in Maryland, Pennsylvania, and elsewhere.

12.     It was further a part of the wire fraud conspiracy that defendant **KEVIN SNIFFEN** and his co-conspirators caused victim investors and borrowers to enter into escrow agreements with defendant **SNIFFEN** and co-conspirator B.M.

13.     It was further a part of the wire fraud conspiracy that defendant **KEVIN SNIFFEN** and his conspirators, in order to gain their victims' confidence, inserted language into

3

these escrow agreements stating, among other things, that: (a) the escrowed funds shall at all times be the sole and exclusive property of the lender-investors or be held for the sole benefit of the lender-investors; (b) the escrowed funds did not belong to any person other than the lender-investor; and (c) neither B.M. nor defendant **KEVIN SNIFFEN**, nor any other person other than the victim investors, had any right, title, claim, or interest in the escrowed funds, or the ability to remove the escrowed funds without the permission of the lender-investor.

14. It was further a part of the wire fraud conspiracy that co-conspirator Patrick Belzner and others known and unknown to the United States Attorney told victim investors that defendant **KEVIN SNIFFEN** had to be the attorney assigned as the escrow account agent. It was further part of the wire fraud conspiracy that defendant **KEVIN SNIFFEN** established escrow bank accounts at Wachovia Bank, N.A.

15. It was further a part of the wire fraud conspiracy that in or about December 2009, defendant **KEVIN SNIFFEN** added co-conspirator B.M. to the signature card for one of the escrow bank accounts and allowed co-conspirators B.M. and Patrick Belzner to remove escrow funds from the escrow accounts.

16. It was further a part of the wire fraud conspiracy that co-conspirators Patrick Belzner, B.M., and others known and unknown to the United States Attorney fraudulently removed funds from the escrow accounts, typically within one or two weeks of the victim's wiring of the money into the escrow accounts. The conspirators accomplished these withdrawals through bank account transfers, the issuance of cashier's checks, electronic fund debits, and other methods.

17. It was further a part of the wire fraud conspiracy that co-conspirators Patrick

4

Belzner and B.M. used these stolen funds to satisfy their business and personal debts.

18.     It was further a part of the wire fraud conspiracy that defendant **KEVIN SNIFFEN** and his co-conspirators caused electronic mails, telephone calls, documents, and funds to be transmitted by wire communications in interstate commerce for the purpose of executing their scheme to defraud, and in attempting to cover up their fraud through a variety of deceptive practices, including but not limited to:

(a)     using electronic mail to convey fabricated bank statements to victims that misrepresented the account balance of the escrow account being maintained by defendant **KEVIN SNIFFEN**;

(b)     using electronic mail and telephone calls to make multiple false representations to victim investors regarding the maintenance of the funds in the investors' escrow accounts, as well as the date by when the investors' money would be returned; and

(c)     using funds fraudulently obtained from certain victim investors to repay, in part, sums owed to previous victim investors, or to other individuals to whom the conspirators owed debts.

19.     As a result of the wire fraud conspiracy, defendant **KEVIN SNIFFEN** and his co-conspirators caused approximately $14,730,780.00 to be wired from victim investor accounts into escrow bank accounts in the name of defendant **KEVIN SNIFFEN**, which funds were subsequently fraudulently withdrawn by the conspirators through the variety of means described above.

18 U.S.C. § 1349

5

## FORFEITURE

The United States Attorney for the District of Maryland further charges:

1.    Pursuant to 18 U.S.C. Section 981(a)(1)(C) and 28 U.S.C. Section 2461(c), upon conviction of an offense in violation of 18 U.S.C. Section 1349, as alleged in Count One,

## KEVIN SNIFFEN,

the defendant herein, shall forfeit to the United States of America all property, real and personal, which constitutes and is derived from proceeds traceable to the scheme to defraud.

2.    The property to be forfeited includes, but is not limited to, a sum of money equal to the value of the proceeds of the scheme to defraud which amount is at least **$14,730,780.00**.

3.    If any of the property described above, as a result of any act or omission of the defendants:

a.    cannot be located upon the exercise of due diligence;

b.    has been transferred or sold to, or deposited with, a third party;

c.    has been placed beyond the jurisdiction of the court;

d.    has been substantially diminished in value; or

e.    has been commingled with other property which cannot be divided without difficulty,

the United States of America shall be entitled to forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c).

18 U.S.C. § 981(a)(1)(C); 18 U.S.C. § 1956(c)(7); 18 U.S.C. § 1961(1); 28 U.S.C. § 2461(c); Rule 32.2(a), F.R.Crim.P.

ROD J. ROSENSTEIN
United States Attorney

DATE: March __7__, 2012