FILED _____ ENTERED
_____ LODGED _____ RECEIVED

APR 02 2012

AT BALTIMORE
CLERK U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY _____ DEPUTY

FILED
U.S. DISTRICT COURT
DISTRICT OF MARYLAND

**U.S. Department of Justice**

2012 MAR 33 A 8: 03

*United States Attorney*
*District of Maryland*
*Northern Division*

---

| | | |
|---|---|---|
| *Rod J. Rosenstein*<br>*United States Attorney*<br><br>*Sean O'Connell*<br>*Assistant United States Attorney* | *36 South Charles Street*<br>*Fourth Floor*<br>*Baltimore, Maryland 21201* | *DIRECT: 410-209-4984*<br>*MAIN: 410-209-4800*<br>*FAX: 410-962-3091*<br>*TTY/TDD: 410-962-4462*<br>*Sean.Oconnell2@usdoj.gov* |

February 13, 2012

**Via U.S. Mail**

Joseph Murtha, Esquire
1301 York Rd., Ste 200 Heaver Plaza
Lutherville, MD 21093
(410) 583-6969

       Re:    United States v. Kevin E. Sniffen

Dear Counsel:

      This letter, together with the Sealed Supplement, confirms the plea agreement which has been offered to the Defendant by the United States Attorney's Office for the District of Maryland ("this Office"). If the Defendant accepts this offer, please have him execute it in the spaces provided below. If this offer has not been accepted by February 17, 2011, it will be deemed withdrawn. The terms of the agreement are as follows:

Offense of Conviction

      1.    The Defendant agrees to waive indictment and plead guilty to a Criminal Information which will charge him with conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349. The Defendant admits that he is, in fact, guilty of that offense and will so advise the Court.

Elements of the Offense

      2.    The elements of the offense to which the Defendant has agreed to plead guilty, conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349, and which this Office would prove if the case went to trial, are as follows:

Revised 11/5/09

1

a.    two or more persons, in some way or manner, entered into an unlawful agreement to commit wire fraud, as charged in the information; and

b.    the Defendant knowingly and willfully became a member of the conspiracy.

The following must be true for a defendant to be guilty of the object offense of wire fraud, in violation of Title 18, United States Code, Section 1343:

a.    That there was a scheme or artifice to defraud or to obtain money or property by materially false and fraudulent pretenses, representations or promises;

b.    That the defendant knowingly and willfully participated in the scheme or artifice to defraud, and aided and abetted others in the scheme, with knowledge of its fraudulent nature and with specific intent to defraud; and

c.    That in execution of that scheme, the defendant used or caused the use of interstate wires.

## Penalties

3.    The maximum sentence provided by statute for the offense to which the Defendant is pleading guilty is as follows: 20 years imprisonment, a fine of $250,000.00 or twice the gross gain or loss resulting from the offense, and a three-year period of supervised release. In addition, the Defendant must pay $100.00 as a special assessment pursuant to 18 U.S.C. § 3013, which will be due and should be paid at or before the time of sentencing. This Court may also order him to make restitution pursuant to 18 U.S.C. §§ 3663, 3663A, and 3664.[1] If a fine or restitution is imposed, it shall be payable immediately, unless, pursuant to 18 U.S.C. § 3572(d), the Court orders otherwise. The Defendant understands that if he serves a term of imprisonment, is released on supervised release, and then violates the conditions of his supervised release, his supervised release could be revoked - even on the last day of the term - and the Defendant could be returned to custody to serve another period of incarceration and a new term of supervised release. The Defendant understands that the Bureau of Prisons has sole discretion in designating the institution at which the Defendant will serve any term of imprisonment imposed.

---

[1]    Pursuant to 18 U.S.C. § 3612, if the Court imposes a fine in excess of $2,500 that remains unpaid 15 days after it is imposed, the Defendant shall be charged interest on that fine, unless the Court modifies the interest payment in accordance with 18 U.S.C. § 3612(f)(3).

## Waiver of Rights

4.      The Defendant understands that by entering into this agreement, he surrenders certain rights as outlined below:

a.      If the Defendant had not waived Indictment, he would have had the right to have the Grand Jury determine whether criminal charges would be brought against him. If the Defendant had pled "not guilty" to the charge in the Information, he would have had the right to a speedy jury trial with the close assistance of competent counsel. That trial could be conducted by a judge, without a jury, if the Defendant, this Office, and the Court all agreed.

b.      If the Defendant elected a jury trial, the jury would be composed of twelve individuals selected from the community. Counsel and the Defendant would have the opportunity to challenge prospective jurors who demonstrated bias or who were otherwise unqualified, and would have the opportunity to strike a certain number of jurors peremptorily. All twelve jurors would have to agree unanimously before the Defendant could be found guilty of any count. The jury would be instructed that the Defendant was presumed to be innocent, and that presumption could be overcome only by proof beyond a reasonable doubt.

c.      If the Defendant went to trial, the government would have the burden of proving the Defendant guilty beyond a reasonable doubt. The Defendant would have the right to confront and cross-examine the government's witnesses. The Defendant would not have to present any defense witnesses or evidence whatsoever. If the Defendant wanted to call witnesses in his defense, however, he would have the subpoena power of the Court to compel the witnesses to attend.

d.      The Defendant would have the right to testify in his own defense if he so chose, and he would have the right to refuse to testify. If he chose not to testify, the Court could instruct the jury that they could not draw any adverse inference from his decision not to testify.

e.      If the Defendant were found guilty after a trial, he would have the right to appeal the verdict and the Court's pretrial and trial decisions on the admissibility of evidence to see if any errors were committed which would require a new trial or dismissal of the charges against him. By pleading guilty, the Defendant knowingly gives up the right to appeal the verdict and the Court's decisions.

f.      By pleading guilty, the Defendant will be giving up all of these rights, except the right, under the limited circumstances set forth in the "Waiver of Appeal" paragraph below, to appeal the sentence. By pleading guilty, the Defendant understands that he may have to answer the Court's questions both about the rights he is giving up and about the facts of his case. Any statements the Defendant makes during such a hearing would not be admissible against him during a trial except in a criminal proceeding for perjury or false statement.

g.    If the Court accepts the Defendant's plea of guilty, there will be no further trial or proceeding of any kind, and the Court will find him guilty.

h.    By pleading guilty, the Defendant will also be giving up certain valuable civil rights and may be subject to deportation or other loss of immigration status. The Defendant recognizes that if he is not a citizen of the United States, pleading guilty may have consequences with respect to his immigration status. Under federal law, conviction for a broad range of crimes can lead to adverse immigration consequences, including automatic removal from the United States. Removal and other immigration consequences are the subject of a separate proceeding, however, and the Defendant understands that no one, including his attorney or the Court, can predict with certainty the effect of a conviction on immigration status. Defendant nevertheless affirms that he wants to plead guilty regardless of any potential immigration consequences.

## Advisory Sentencing Guidelines Apply

5.    The Defendant understands that the Court will determine a sentencing guidelines range for this case (henceforth the "advisory guidelines range") pursuant to the Sentencing Reform Act of 1984 at 18 U.S.C. §§ 3551-3742 (excepting 18 U.S.C. §§ 3553(b)(1) and 3742(e)) and 28 U.S.C. §§ 991 through 998. The Defendant further understands that the Court will impose a sentence pursuant to the Sentencing Reform Act, as excised, and must take into account the advisory guidelines range in establishing a reasonable sentence.

## Factual and Advisory Guidelines Stipulation

6.    (a) This Office and the Defendant understand, agree and stipulate to the Statement of Facts set forth in Attachment A hereto which this Office would prove beyond a reasonable doubt, and to the following applicable sentencing guidelines factors:

(b) The relevant sentencing factors are as follows:

| | | |
|---|---|---|
| Base Offense Level: | 7 | [U.S.S.G. § 2B1.1(a)(1)] |
| Specific Offense Characteristics: | | |
| Loss up to $20,000,000: | 20 | [U.S.S.G. § 2B1.1(b)(1)(K)] |
| Abuse of a position of trust/use of a special skill: | 2 | [U.S.S.G. § 3B1.3] |
| SUBTOTAL: | 29 | |

4

This Office does not oppose a two-level reduction in the Defendant's adjusted offense level, based upon the Defendant's apparent prompt recognition and affirmative acceptance of personal responsibility for his criminal conduct. This Office agrees to make a motion pursuant to U.S.S.G. § 3E1.1(b) for an additional one-level decrease in recognition of the Defendant's timely notification of his intention to plead guilty. This Office may oppose *any* adjustment for acceptance of responsibility if the Defendant (a) fails to admit each and every item in the factual stipulation; (b) denies involvement in the offense; (c) gives conflicting statements about his involvement in the offense; (d) is untruthful with the Court, this Office, or the United States Probation Office; (e) obstructs or attempts to obstruct justice prior to sentencing; (f) engages in any criminal conduct between the date of this agreement and the date of sentencing; or (g) attempts to withdraw his plea of guilty.

Thus, the final anticipated base offense level is a **26**.

7. The Defendant understands that there is no agreement as to his criminal history or criminal history category, and that his criminal history could alter his offense level if he is a career offender or if the instant offense was a part of a pattern of criminal conduct from which he derived a substantial portion of his income.

## Guidelines Factors Not Stipulated

8. This Office and the Defendant agree that with respect to the calculation of the advisory guidelines range no *other* offense characteristics, sentencing guidelines factors, potential departures or adjustments set forth in the United States Sentencing Guidelines will be raised or are in dispute.

## Obligations of the United States Attorney's Office

9. At the time of sentencing, this Office will recommend a sentence within the advisory guidelines range determined by the Court. This Office agrees to bring no further charges against the Defendant arising from the conduct described in the Statement of Facts.

10. The parties reserve the right to bring to the Court's attention at the time of sentencing, and the Court will be entitled to consider, all relevant information concerning the Defendant's background, character and conduct, including uncharged conduct.

## Restitution

11. The Defendant agrees to the entry of a Restitution Order in an amount to be determined by the Court. The Defendant agrees that, pursuant to 18 U.S.C. §§ 3663 and 3663A and

§§ 3563(b)(2) and 3583(d), the Court may order restitution of the full amount of the actual, total loss caused by the offense conduct set forth in the factual stipulation. The Defendant further agrees that he will fully disclose to the probation officer and to the Court, subject to the penalty of perjury, all information, including but not limited to copies of all relevant bank and financial records, regarding the current location and prior disposition of all funds obtained as a result of the criminal conduct set forth in the factual stipulation. The Defendant further agrees to take all reasonable steps to retrieve or repatriate any such funds and to make them available for restitution. If the Defendant does not fulfill this provision, it will be considered a material breach of this plea agreement, and this Office may seek to be relieved of its obligations under this agreement.

### Forfeiture

12.     The defendant understands that the court will, upon acceptance of his guilty plea, enter an order of forfeiture as part of his sentence, and that the order of forfeiture may include assets directly traceable to his offense, substitute assets and/or a money judgment equal to the value of the property derived from, or otherwise involved in, the offense. Specifically, the court will order the forfeiture of all property, real and personal, which constitutes and is derived from proceeds traceable to the scheme to defraud; at sentencing, the Court will determine the amount to be forfeited. The defendant agrees to consent to the entry of orders of forfeiture for such property and waives the requirements of Federal Rules of Criminal Procedure 11(b)(1)(J), 32.2 and 43(a) regarding notice of the forfeiture in the charging instrument, advice regarding the forfeiture at the change-of-plea hearing, announcement of the forfeiture at sentencing, and incorporation of the forfeiture in the judgment. The Office agrees to request that the Attorney General restore any forfeited assets and apply them to the Defendant's Restitution Order.

### Assisting the Government with Regard to the Forfeiture

13.     The defendant agrees to assist fully in the forfeiture of the foregoing assets. The defendant agrees to disclose all of his assets and sources of income to the United States, and to take all steps necessary to pass clear title to the forfeited assets to the United States, including but not limited to executing any and all documents necessary to transfer such title, assisting in bringing any assets located outside of the United States within the jurisdiction of the United States, and taking whatever steps are necessary to ensure that assets subject to forfeiture are not sold, disbursed, wasted, hidden or otherwise made unavailable for forfeiture. The defendant further agrees that he will not assist any third party in asserting a claim to the forfeited assets in an ancillary proceeding and that he will testify truthfully in any such proceeding.

### Waiver of Appeal

14.     In exchange for the concessions made by this Office and the Defendant in this plea agreement, this Office and the Defendant waive their rights to appeal as follows:

a) The Defendant knowingly waives all right, pursuant to 28 U.S.C. § 1291 or otherwise, to appeal the Defendant's conviction;

b) The Defendant and this Office knowingly waive all right, pursuant to 18 U.S.C. § 3742 or otherwise, to appeal whatever sentence is imposed (including the right to appeal any issues that relate to the establishment of the advisory guidelines range, the determination of the defendant's criminal history, the weighing of the sentencing factors, and the decision whether to impose and the calculation of any term of imprisonment, fine, order of forfeiture, order of restitution, and term or condition of supervised release), except as follows: (i) the Defendant reserves the right to appeal any term of imprisonment to the extent that it exceeds 78 months' imprisonment; (ii) and this Office reserves the right to appeal any term of imprisonment to the extent that it is below 63 months' imprisonment.

c) Nothing in this agreement shall be construed to prevent the Defendant or this Office from invoking the provisions of Federal Rule of Criminal Procedure 35(a), or from appealing from any decision thereunder, should a sentence be imposed that resulted from arithmetical, technical, or other clear error.

d) The Defendant waives any and all rights under the Freedom of Information Act relating to the investigation and prosecution of the above-captioned matter and agrees not to file any request for documents from this Office or any investigating agency.

### Obstruction or Other Violations of Law

15.     The Defendant agrees that he will not commit any offense in violation of federal, state or local law between the date of this agreement and his sentencing in this case. In the event that the Defendant (i) engages in conduct after the date of this agreement which would justify a finding of obstruction of justice under U.S.S.G. § 3C1.1, or (ii) fails to accept personal responsibility for his conduct by failing to acknowledge his guilt to the probation officer who prepares the Presentence Report, or (iii) commits any offense in violation of federal, state or local law, then this Office will be relieved of its obligations to the Defendant as reflected in this agreement. Specifically, this Office will be free to argue sentencing guidelines factors other than those stipulated in this agreement, and it will also be free to make sentencing recommendations other than those set out in this agreement. As with any alleged breach of this agreement, this Office will bear the burden of convincing the Court of the Defendant's obstructive or unlawful behavior and/or failure to acknowledge personal responsibility by a preponderance of the evidence. The Defendant acknowledges that he may not withdraw his guilty plea because this Office is relieved of its obligations under the agreement pursuant to this paragraph.

## Court Not a Party

16.     The Defendant expressly understands that the Court is not a party to this agreement. In the federal system, the sentence to be imposed is within the sole discretion of the Court. In particular, the Defendant understands that neither the United States Probation Office nor the Court is bound by the stipulation set forth above, and that the Court will, with the aid of the Presentence Report, determine the facts relevant to sentencing. The Defendant understands that the Court cannot rely exclusively upon the stipulation in ascertaining the factors relevant to the determination of sentence. Rather, in determining the factual basis for the sentence, the Court will consider the stipulation, together with the results of the presentence investigation, and any other relevant information. The Defendant understands that the Court is under no obligation to accept this Office's recommendations, and the Court has the power to impose a sentence up to and including the statutory maximum stated above. The Defendant understands that if the Court ascertains factors different from those contained in the stipulation set forth above, or if the Court should impose any sentence up to the maximum established by statute, the Defendant cannot, for that reason alone, withdraw his guilty plea, and will remain bound to fulfill all of his obligations under this agreement. The Defendant understands that neither the prosecutor, his counsel, nor the Court can make a binding prediction, promise, or representation as to what guidelines range or sentence the Defendant will receive. The Defendant agrees that no one has made such a binding prediction or promise.

## Entire Agreement

17.     This letter supersedes any prior understandings, promises, or conditions between this Office and the Defendant and, together with the Sealed Supplement, constitutes the complete plea agreement in this case. The Defendant acknowledges that there are no other agreements, promises, undertakings or understandings between the Defendant and this Office other than those set forth in this letter and the Sealed Supplement and none will be entered into unless in writing and signed by all parties.

If the Defendant fully accepts each and every term and condition of this agreement, please sign and have the Defendant sign the original and return it to me promptly.

Very truly yours,

Rod J. Rosenstein
United States Attorney

By:_____
Sean O'Connell

8

Sujit Raman
Assistant United States Attorneys

I have read this agreement, including the Sealed Supplement, and carefully reviewed every part of it with my attorney. I understand it, and I voluntarily agree to it. Specifically, I have reviewed the Factual and Advisory Guidelines Stipulation with my attorney, and I do not wish to change any part of it. I am completely satisfied with the representation of my attorney.

2/22/12
Date

Kevin E. Sniffen

I am Kevin Sniffen's attorney. I have carefully reviewed every part of this agreement, including the Sealed Supplement, with him. He advises me that he understands and accepts its terms. To my knowledge, his decision to enter into this agreement is an informed and voluntary one.

2/22/12
Date

Joseph Murtha, Esq.

9

## ATTACHMENT A
## STATEMENT OF FACTS

*If this case were to go to trial, the United States would prove the following beyond a reasonable doubt, by admissible testimonial and documentary evidence: the guilt of the Defendant on the charge of conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349. The facts outlined below do not constitute all of the facts the government would be able to prove had the case proceeded to trial.*

As described in the Criminal Information, defendant **Kevin Sniffen** at all relevant times:

1) Defendant **Kevin Sniffen** is an attorney, licensed to practice law in the State of Maryland.

2) B.M. is a home builder who lived in Baltimore, Maryland, who was the registered agent and owner of several Maryland corporate entities, including, but not limited to: a) The McCloskey Group, LLC; b) 1100 Columbia York PA LLC; c) Claires Lane, LLC; and d) Kellen Property & Investment LLC.

3) P.B. is a home builder who lived in Glen Arm, Maryland and used aliases, including "Patrick McCloskey," as part of a scheme to defraud lenders and investors.

4) P.B. and B.M. sought investors to pay off existing debts on real estate projects and to fund real estate development in Maryland, Pennsylvania, and elsewhere.

5) M.P. resides in or around Newport Beach, California. M.P. presented himself as the "Senior Underwriter" of Insurance Annuity Group ("IAG") Underwriters LLC and IAG Underwriters Inc., with subsidiaries: Workmen's Life Insurance Company, Preferred Senior Holding, LLC, Teachers Annuity Group, LLC (collectively "IAG"). IAG was located at 610 Newport Center Drive, Suite 600 Newport Beach, California 92660.

6) G.G. is an attorney licensed in California who resided in Santa Ana, California and was in house counsel for IAG.

7) Defendant **Kevin Sniffen**, P.B., B.M., M.P., and G.G., made representations or caused representations to be made to victim investors that IAG had either secured loans or could procure loans for various real estate development projects. Investors were told by P.B. and M.P. that in order to obtain lending from IAG, IAG required a showing of "liquidity." Victim investors were told that, in exchange for a high rate of return, they would fund the proof of "liquidity" by depositing large sums of money into an escrow account. P.B., B.M., and M.P. required that defendant **Kevin Sniffen** be the only attorney assigned as escrow account agent.

8) All of the escrow agreements used to defraud the lender-investors provided that: a) the

10

escrowed funds shall at all times be the sole and exclusive property of the lender-investors; b) the escrowed funds did not belong to defendant **Kevin Sniffen**, P.B., B.M., M.P., G.G., or any person other than the lender-investor; and c) defendant **Kevin Sniffen**, nor any other person other than the investor had any right, title, claim, or interest in the escrowed funds, or the ability to remove the escrowed funds without the permission of the lender-investor.

9) The loans that IAG was either attempting to underwrite or attempting to secure from third-party lenders were either for the victims' own real estate construction purposes or to fund the real estate construction projects of P.B. and B.M. located in Maryland, Pennsylvania, and elsewhere.

10) **Kevin Sniffen**, P.B., and B.M. defrauded investors by fraudulently removing funds from the escrow accounts that he maintained in contravention of the escrow agreement. Pursuant to the escrow agreement, the investor victim deposited the funds into the escrow account maintained by **Kevin Sniffen**. Typically within one or two weeks of the deposit, **Kevin Sniffen**, P.B., and B.M. caused the victim's funds to be withdrawn from the escrow accounts to pay business and personal debts of P.B., B.M., and M.P. or to make lulling payments to other victim investors.

11) Defendant **Kevin Sniffen**, P.B., B.M., M.P., and G.G. attempted to cover up their fraud through a variety of deceptive practices. Defendant **Kevin Sniffen**, P.B., and B.M. issued or caused to be issued false verifications of deposits and false bank statements related to the funds that victims placed in escrow accounts with defendant **Kevin Sniffen**. Defendant **Kevin Sniffen**, P.B., B.M., M.P., and G.G. made multiple false representations via emails and phone calls regarding the existence of escrow funds in the investors' escrow accounts and the timing of when the investors money would be returned to them. Defendant **Kevin Sniffen**, P.B., B.M., and M.P., caused victim investors to be re-paid partial sums of their investment, using funds fraudulently obtained from other investors.

12) Defendant **Kevin Sniffen**, P.B., B.M., M.P., and G.G. defrauded victim investors who had invested through the following entities: 1) Grebow Properties, LLC; 2) Namkeb, LLC; 3) Repid LLC; 4) Hosdevco, LLC; 5) Tyler Mechanical; and 6) Murcielago LLC. Defendant **Kevin Sniffen**, P.B., B.M., M.P., and G.G. diverted or otherwise improperly obtained funds from investor victims in excess of $14,000,000.00.

I. **S.G. Escrow Fraud**

13) In or around August 2009, P.B. and B.M. were attempting to obtain financing from S.G., a private lender in Hanover, Maryland. P.B. told S.G. that he needed $2,250,000.00 from S.G. to satisfy the "liquidity requirements" in order to receive $20 million in HUD financing for the development of real property in York, Pennsylvania into a senior assisted living facility. P.B. told S.G. that defendant **Kevin Sniffen** would hold S.G.'s money in an escrow account to show M.P. of IAG that they had the liquidity necessary to get HUD financing for the project. P.B. told S.G. and defendant **Kevin Sniffen** that M.P. was a HUD broker. M.P. confirmed P.B.'s statements that

11

escrow funds from S.G. could be used to meet the liquidity requirements established by HUD. M.P. stated that S.G.'s escrow funds could be referred to as B.M.'s money for liquidity purposes.

14)     In or around December 2009, S.G. and defendant **Kevin Sniffen** and B.M. entered into an escrow agreement (the "First S.G. Escrow Agreement"). Defendant **Kevin Sniffen** was required to maintain a $2,200,000.00 balance in the escrow account.

15)     On or about December 11, 2009, pursuant to the First S.G. Escrow Agreement, S.G. caused $2,250,000.00 to be wired into defendant **Kevin Sniffen**'s Wachovia escrow account ending in #8685. Also on or about December 11, 2009, B.M. signed as an "Account Authorized Signer" for defendant **Kevin Sniffen**'s Wachovia escrow account ending in #8685.

16)     On or about December 14, 2009, P.B. demanded that defendant **Kevin Sniffen** turn control over the escrow account over to P.B. and B.M. In response, defendant **Kevin Sniffen** explained that B.M. already had signatory authority over the Wachovia escrow account ending in #8685. Defendant **Kevin Sniffen** gave P.B. and B.M. the signature card for the Wachovia escrow account ending in #8685.

17)     On or about December 14, 2009 and on or about December 23, 2009, B.M., following the directions of P.B., transferred $2,249,000.00 of S.G.'s escrow funds from defendant **Kevin Sniffen**'s Wachovia escrow account ending in #8685 in the following manner:

| Date | Amount | From | To |
|------|--------|------|-----|
| 12/14/2009 | $2,230,000.00 | Sniffen Wachovia escrow acct. #8685 | 1100 Columbia York, LLC Wachovia acct. ending in #3061 |
| 12/23/2009 | $19,000.00 | Sniffen Wachovia escrow acct. #8685 | 1100 Columbia York, LLC Wachovia acct. ending in #3061 |

18)     In or around January 2010, S.G. requested a bank statement for the escrow account ending in #8685 to verify that his $2,200,000 investment was being maintained by defendant **Kevin Sniffen**. Defendant **Kevin Sniffen** contacted Wachovia Bank who confirmed that S.G.'s escrow funds had been withdrawn. Defendant **Kevin Sniffen**, met with P.B. and B.M. in Baltimore County, Maryland to determine how they were going to satisfy S.G.'s request for a bank statement. P.B., B.M., and defendant **Kevin Sniffen** agreed that they would create a fictitious bank statement that reflected an account balance of $2,250,000.00 and email it to S.G. Shortly thereafter, B.M. emailed a fabricated bank statement for account number ending in #8685 to defendant **Kevin Sniffen** that reflected a balance of $2,250,000.00. Defendant **Kevin Sniffen** further altered the fabricated bank statement and emailed it to S.G.

19)     In or around May 2010, P.B. solicited another $1,300,000.00 from S.G. P.B. represented to

S.G. that he was still attempting to satisfy the liquidity requirements in order to secure the HUD financing for the York, Pennsylvania project. Based on terms negotiated by P.B., in or about May 2010, S.G. and defendant **Kevin Sniffen** and B.M. entered into a second escrow agreement (the "Second S.G. Escrow Agreement"). Pursuant to the Second S.G. Escrow Agreement, on or about May 11, 2010, S.G. caused $1,300,000.00 to be wired into defendant **Kevin Sniffen**'s escrow account at Wachovia Bank account number ending in #8685.

20)     On or about May 11, 2010, B.M., following the directions of P.B., signed a counter-withdrawal form and withdrew $528,000.00 of S.G.'s escrow funds from defendant **Kevin Sniffen**'s Wachovia escrow account ending in #8685 through the issuance of the following cashier's checks:

| Date | Cashier Check # | Amount |
|------|----------------|--------|
| 5/11/2010 | 1302243906 | $15,000.00 |
| 5/11/2010 | 1302243907 | $25,000.00 |
| 5/11/2010 | 1302243908 | $5,000.00 |
| 5/11/2010 | 1302243909 | $7,000.00 |
| 5/11/2010 | 1302243910 | $200,000.00 |
| 5/11/2010 | 1302243911 | $10,000.00 |
| 5/11/2010 | 1302243912 | $6,000.00 |
| 5/11/2010 | 1302243913 | $260,000.00 |

21)     On or about May 12, 2010, B.M. signed debit/credit memos that transferred $770,000.00 of S.G.'s escrow funds from defendant **Kevin Sniffen**'s Wachovia escrow account ending in #8685 to the McCloskey Group's Wachovia account ending in #2884.

22)     In or around June 2010, defendant **Kevin Sniffen** set up online access to his Wachovia Bank escrow account ending in #8685. Defendant **Kevin Sniffen** gave P.B. and B.M. his password so that they could access the escrow account at any time.

23)     In or around October 2010, S.G. requested that his escrow funds be returned to him. S.G. requested verification that his escrow funds were still in the account maintained by defendant **Kevin Sniffen** at Wachovia Bank. On or about October 12, 2010 and October 14, 2010, defendant **Kevin Sniffen** or B.M., acting at the direction of P.B. and others, deposited the following checks totaling $2,318,280.00 at the Wachovia Bank in Timonium, Maryland into the escrow account ending in #8685 in order to provide false verification to S.G. that his money was still in defendant **Kevin Sniffen's** escrow account:

13

| Date | Check # | Amount | From | To |
|---|---|---|---|---|
| 10/11/2010 | 1134 | $300,000.00 | McCloskey Group LLC Northwest Savings Bank account #4218 | Sniffen Wachovia escrow acct. #8685 |
| 10/11/2010 | 1135 | $250,000.00 | McCloskey Group LLC Northwest Savings Bank account #4218 | Sniffen Wachovia escrow acct. #8685 |
| 10/14/2010 | 2991 | $429,280.00 | CNN Properties LLC Susquehanna Bank account #9123 | Sniffen Wachovia escrow acct. #8685 |
| 10/14/2010 | 1594 | $327,000.00 | Kellen Property & Investment, Patapsco Bank account #2029 | Sniffen Wachovia escrow acct. #8685 |
| 10/14/2010 | 1138 | $462,000.00 | Star Services, Susquehanna Bank account #0259 | Sniffen Wachovia escrow acct. #8685 |
| 10/14/2010 | 1136 | $550,000.00 | McCloskey Group LLC Northwest Savings Bank account #4218 | Sniffen Wachovia escrow acct. #8685 |

24)     On or about October 14, 2010, B.M. transferred $2,780,000.00 from the McCloskey Group LLC Wachovia account to defendant **Kevin Sniffen**'s Wachovia escrow account ending in #8685.

25)     On or about October 14, 2010, defendant **Kevin Sniffen** caused an employee at Wachovia Bank to verbally verify the escrow account balance of approximately $2,780,000.00 to S.G. who was on the telephone.  Pursuant to P.B.'s instructions, defendant **Kevin Sniffen** also caused $300,000.00 to be transferred from his Wachovia escrow account ending in #8685 to S.G.'s Carrollton Bank account.

26)     On or about October 15, 2010, after S.G. was provided with a verification of the escrow account balance, B.M. and P.B. placed a stop payment on the McCloskey Group LLC checks #1134 and #1135.

27)     On or about October 15, 2010, after S.G. was provided with a verification of the escrow account balance, B.M. made the following transfers from the Wachovia escrow account ending in #8685:

| Date | Amount | From | To |
|------|--------|------|-----|
| 10/15/2010 | $434,000.00 | Sniffen Wachovia escrow acct. #8685 | CNN Properties LLC Susquehanna Bank account #9123 |
| 10/15/2010 | $330,000.00 | Sniffen Wachovia escrow acct. #8685 | Kellen Property & Investment, Patapsco Bank account #2029 |
| 10/15/2010 | $465,000.00 | Sniffen Wachovia escrow acct. #8685 | Star Services, Susquehanna Bank account #0259 |
| 10/15/2010 | $565,000.00 | Sniffen Wachovia escrow acct. #8685 | McCloskey Group LLC Northwest Savings Bank account #4218 |

## II.  **B.L. Escrow Fraud**

28)  During Summer 2010, P.B. and B.M. solicited victim investor B. L. to place $3.3 million into an escrow account for four (4) to six (6) months, so they could obtain financing from an insurance company. P.B. and B.M. explained that their lenders would use the $3.3 million as "liquidity." P.B. and B.M. told B.L. that they were trying to secure a loan from IAG in order to develop the York, Pennsylvania real estate project. P.B. and B.M. told B.L. that they needed B.L. to place funds into an escrow account controlled by defendant **Kevin Sniffen**, so P.B. and B.M. could meet the liquidity requirements set by IAG. Once the liquidity requirements were met, IAG would provide P.B. and B.M. with a loan for the construction project.

29)  In or about September 2010, P.B. and M.P. stated to B.L. that defendant **Kevin Sniffen** had to be the escrow attorney because defendant **Kevin Sniffen** was approved by IAG's board of directors and was provided with a certification from IAG.

30)  P.B. repeatedly used the fake name "Patrick McCloskey" when communicating with B.L. Prior to a meeting with B.L. in or around January 2011, P.B. instructed defendant **Kevin Sniffen** not to use P.B.'s real name and instead use the name "Patrick McCloskey."

31)  On or about September 14, 2010, B.L. and defendant **Kevin Sniffen** and B.M. entered into an escrow agreement (the "Namkeb Escrow Agreement").

32)  On or about September 15, 2010, the law firm representing Namkeb and holding Namkeb's funds wired $3,300,000.00 from the law firm's Bank of America account ending in #4330 to defendant **Kevin Sniffen**'s Wachovia bank account ending in #8685 pursuant to the Namkeb Escrow

15

Agreement.

33) On or about September 15, 2010, B.M., following the directions of P.B., signed a Debit Memo and withdrew $3,250,000.00 of Namkeb's escrow funds from defendant **Kevin Sniffen**'s Wachovia escrow account ending in #8685. Of Namkeb's $3,250,000.00, B.M. deposited $1,062,000.00 into the McCloskey Group Wachovia bank account ending in #2884. The remaining $2,188,000.00 was disbursed from defendant **Kevin Sniffen**'s Wachovia escrow account ending in #8685 through the issuance of the following cashier's checks:

| Date | Cashier's Check # | Amount |
|------|-------------------|--------|
| 9/15/2010 | 1302290344 | $1,420,000.00 |
| 9/15/2010 | 1302290345 | $220,000.00 |
| 9/15/2010 | 1302290346 | $198,000.00 |
| 9/15/2010 | 1302290347 | $55,000.00 |
| 9/15/2010 | 1302290348 | $295,000.00 |

34) In or around the Fall of 2010, P.B. and B.M. solicited more investments from B.L. On or about December 22, 2010, B.L., acting on behalf of Repid, LLC, entered into an escrow agreement (the "First Repid LLC Escrow Agreement") with defendant **Kevin Sniffen** and B.M. On or about December 22, 2010, B.L. wired $1,550,000.00 from Repid, LLC's Community First bank account ending in #0422 to defendant **Kevin Sniffen**'s Wachovia escrow account ending in #4719.

35) On or about December 22, 2010 and December 23, 2010, defendant **Kevin Sniffen**, P.B., and B.M. caused B.L./Repid's escrow funds to be removed from the defendant **Kevin Sniffen**'s Wachovia escrow account ending in #4719 by transferring $1,520,000.00 into defendant **Kevin Sniffen**'s Wachovia escrow account ending in #8685. On or about December 23, 2010, B.M. transferred at least $200,000.00 from account #8685 into the McCloskey Group Wachovia account ending in #2884. Almost all of the remaining $1,320,000.00 of B.L.'s escrow funds was removed through the issuance of the following cashier's checks from defendant **Kevin Sniffen**'s Wachovia escrow account ending in #8685:

| Date | Cashier's Check # | Amount |
|------|-------------------|--------|
| 12/23/2010 | 1302290269 | $803,000.00 |
| 12/23/2010 | 1302290270 | $42,000.00 |

| | | |
|---|---|---|
| 9/15/2010 | 1302290271 | $405,000.00 |

36)    On or about January 5, 2011, B.L., acting on behalf of Repid LLC, entered into the second escrow agreement (the "Second Repid LLC Escrow Agreement") with defendant **Kevin Sniffen** and B.M.  On or about January 5, 2011 though January 7, 2011, B.L. wired $1,185,000.00 from Repid, LLC's Community First bank account ending in #0422 to defendant **Kevin Sniffen**'s Wachovia escrow account ending in #4719 pursuant to the Second Repid LLC Escrow Agreement.

37)    On or about January 5, 2011 through January 7, 2011, defendant **Kevin Sniffen**, P.B., and B.M. caused $1,175,000.00 of B.L. Repid's escrow funds to be transferred from the defendant **Kevin Sniffen**'s Wachovia escrow account ending in #4719 into defendant **Kevin Sniffen**'s Wachovia escrow account ending in # 8685.  On or about January 6, 2011, B.M., acting at the direction of P.B., caused $711,000.00 to be transferred from the #8685 escrow account to G.C.'s Bank of America account ending in #6122.  (G.C. is a real estate developer that P.B. owed money in connection with prior real estate purchases.)  On or about January 6, 2011 and January 7, 2011, B.M. and his co-conspirators deposited $180,000.00 into the McCloskey Group Wachovia account ending in #2884. Almost all of the remaining B.L. Repid's escrow funds was removed from escrow through the issuance of the following cashier's checks from defendant **Kevin Sniffen**'s Wachovia escrow account ending in #8685:

| Date | Cashier's Check # | Amount |
|---|---|---|
| 1/6/2011 | 1302326807 | $220,000.00 |
| 1/6/2011 | 1302326808 | $20,000.00 |
| 1/6/2011 | 1302326809 | $10,000.00 |

38)    On or about January 15, 2011, B.L.'s Namkeb LLC Escrow Agreement expired and defendant **Kevin Sniffen** was required to return the $3.3 million of escrowed funds and pay an additional $1,000,000.00 in fees to Namkeb LLC.  P.B. and B.M. asked B.L. for an extension because IAG and its representatives did not provide funding for the real estate development projects.

39)    On or about January 25, 2011, and January 31, 2011, B.M. and P.B. made lulling payments of investment fees owed to B.L. due to the expiration of the Namkeb escrow agreement by transferring over $500,000.00 from the Repid LLC escrow accounts ending in #4722 and #4719 to bank accounts controlled by B.L.

40)    On or about February 1, 2011, B.L. called defendant **Kevin Sniffen** and demanded to meet at B.L.'s office in Reisterstown, Maryland to verify that the more than $6,000,000.00 in Namkeb and Repid escrow funds were still in the designated escrow accounts.  Defendant **Kevin Sniffen**, P.B. and B.M. met at one of B.M.'s homes that was under construction to discuss how to deal with B.L.

17

Defendant **Kevin Sniffen** met B.L. at B.L.'s office in Reisterstown, Maryland. B.L. was on the phone with P.B. when defendant **Kevin Sniffen** arrived at B.L.'s office. Defendant **Kevin Sniffen** overheard P.B. falsely stating to B.L. that B.L.'s escrow funds were in a sub-account that defendant **Kevin Sniffen** had set up with Wells Fargo Bank in California. P.B. falsely explained that this account was set up so that M.P. could verify deposits easier. Defendant **Kevin Sniffen** falsely confirmed P.B.'s story that the Namkeb, LLC and Repid, LLC funds were in a Wells Fargo account in California. B.L. required further verification. P.B. told B.L. that it would take a few days to get a balance verification. B.M. emailed a fabricated Wells Fargo bank statement to B.L. in order to verify that the funds were in defendant **Kevin Sniffen**'s control.

41)    In order to deceive B.L. into believing that his escrow funds were still in the Namkeb LLC and Repid LLC escrow accounts, on or about February 2, 2011, defendant **Kevin Sniffen** deposited three (3) Preferred Senior Holding LLC checks numbered 2001, 2002, and 2003 and signed by S.K., the administrative assistant for M.P. and IAG, totaling $7,400,000 into the Wachovia Bank escrow account ending in #8685. These checks were drawn on Preferred Senior Holding LLC's Wells Fargo account ending in #3267, which had a balance of $15,701.88 on February 2, 2011.

42)    On or about February 3, 2011, defendant **Kevin Sniffen** went with B.L. to the Wachovia Bank on York Road in Timonium, Maryland and received a false bank balance that the Namkeb, LLC and Repid, LLC funds were in the Wachovia Bank escrow account ending in #8685. Defendant **Kevin Sniffen** apologized for removing B.L.'s escrow funds from the #4719 and #4722 accounts without B.L.'s permission.

43)    On or about February 7, 2011, the three (3) Preferred Senior Holding LLC checks totaling $7,400,000 bounced because they were drawn on an account that had a balance of $15,701.88. Wachovia Bank reversed the February 2, 2011 deposit and subtracted the $7,400,000 from the balance of defendant **Kevin Sniffen**'s escrow account ending in #8685.

44)    In or about February 2011, P.B. and B.M. told B.L. that IAG funded one of the real estate projects and sent B.L. investment fee lulling payments of $544,00.00 from defendant **Kevin Sniffen**'s escrow account ending in #8685. These lulling payments came from escrow fraud victim E.M., not IAG. In order to conceal this fraud, defendant **Kevin Sniffen**, at the direction of P.B. and B.M., prepared a fake settlement statement that falsely stated that P.B. and B.M. attended the settlement for the purchase of a property in Ocean City that P.B. had acquired one year earlier, in February 2010.

45)    On or about July 14, 2011, defendant **Kevin Sniffen** emailed B.L. a fictitious bank statement that showed a balance of $6,777,545.00 in the Wachovia escrow accounts for Namkeb and Repid ending in #8685, #4719, and #4722. The actual balance of these accounts on July 14, 2011 was approximately $838.21.

III.    **E.M. Escrow Fraud**

46)     In or around January 2011, P.B. and defendant **Kevin Sniffen** met with E.M. and his associates. E.M. was attempting to finance a hotel project in Bowie, Maryland. M.P. told E.M. that in order for IAG to obtain financing for E.M.'s project, E.M. needed to put money in defendant **Kevin Sniffen's** escrow account to meet IAG's liquidity requirements. M.P. told E.M. that once E.M. provided the escrow funds, IAG would provide financing for E.M.'s construction project. P.B. represented himself to E.M. and E.M.'s associates as "Patrick McCloskey".

47)     On or about January 21, 2011, E.M., defendant **Kevin Sniffen**, and B.M. entered into an escrow agreement (the "Hospitality Development Company Escrow Agreement"). The Hospitality Development Company Escrow Agreement stated that E.M. would deposit $1,347,526.00 in an escrow account established by defendant **Kevin Sniffen** for the benefit of E.M.'s company. The Hospitality Development Company Escrow Agreement also stated that the escrowed funds would be returned to E.M.'s company on March 31, 2011.

48)     On or about the following dates, E.M. caused to be wired $1,265,000.00 pursuant to the Hospitality Development Company Escrow Agreement:

| Date | Amount | Payor, Bank & Account No. | Sniffen Escrow Account No. |
|------|--------|---------------------------|----------------------------|
| 1/21/2011 | $450,000.00 | Hospitality Development Co., LLC Columbia Bank acct. #5701 | Wells Fargo acct. #8685 |
| 1/21/2011 | $600,000.00 | Hospitality Development Co. II, LLC | Wells Fargo acct. #8685 |
| 1/31/2011 | $20,000.00 | Hospitality Development Co., LLC Columbia Bank acct. #5701 | Wells Fargo acct. #8685 |
| 1/31/2011 | $80,000.00 | Murphy Management Co., LLC M& T Bank acct. # 1019 | Wells Fargo acct. #8685 |
| 2/9/2011 | $100,000.00 | E.M. Columbia Bank acct. #8282 | Wells Fargo acct. #8685 |
| 2/11/2011 | $15,000.00 | E.M. Columbia Bank acct. #8282 | Wells Fargo acct. #8685 |

49)     From in or about January 21, 2011 through in or about February 14, 2011, defendant **Kevin Sniffen**, P.B., B.M., and M.P. caused approximately $1,262,354.26 of E.M.'s escrow funds to be removed from the defendant **Kevin Sniffen's** Wachovia Bank escrow account ending in #8685 through numerous cashier's checks, wires, and online transfers.

50)     In or around February 15, 2011, G.G. and P.B. told E.M. that he needed to provide more liquidity in order to receive funding from IAG for the Bowie hotel project.

19

51) On or about February 15, 2011, P.B., acting as a representative for IAG, and P.J., a title attorney, went to E.M.'s office and presented E.M. with completed HUD-1 settlement statements and refinance documents that would cause E.M. to take out an additional $2.1 million against the E.M.'s construction site in Bowie, Maryland. P.B. explained that the $2.1 million would be part of the existing escrow agreement that E.M. had with defendant **Kevin Sniffen** and was required in order for IAG to secure funding for E.M.'s hotel construction.

52) On or about February 15, 2011, E.M. caused $2,010,780.00 to be transferred from Lawyers Trust Title Company, LLC's M&T Bank Account ending in #9801 to defendant **Kevin Sniffen's** escrow account ending in #8685. E.M. signed an "Amendment to the Escrow Agreement" dated February 16, 2011, which stated that the "Escrowed Funds are now . . . $4,162.000.00" and that all of the terms of the Hospitality Development Company Escrow Agreement remained in effect.

53) On or about the following dates, defendant **Kevin Sniffen**, P.B., B.M. and M.P. caused E.M.'s escrow funds to be removed from the defendant **Kevin Sniffen's** Wachovia escrow account ending in #8685:

| Date | Amount | To |
| --- | --- | --- |
| 2/15/2011 | $150,000.00 | Counter Withdrawal |
| 2/15/2011 | $1,450,000.00 | Funds Transfer to G.C.'s Bank of America acct. #6122 |
| 2/16/2011 | $13,000.00 | Counter Withdrawal |
| 2/17/2011 | $544,000.00 | Funds Transfer to Repid, LLC's Community First acct. # 0422 (referred to in Paragraph 44 above) |

54) On or about May 3, 2011, defendant **Kevin Sniffen**, as directed by P.B., emailed a fabricated Wachovia bank statement to E.M. that stated that defendant **Kevin Sniffen's** Wachovia escrow account ending in #8685 had a balance of $4,281,600.00. The actual account balance for the #8685 account on May 3, 2011 was $556.87.

## IV. G.T. Escrow Fraud

55) In April 2011, P.B. offered G.T. of Tyler Mechanical a 25% return on a short-term escrow investment. On or about April 20, 2011, G.T. entered into an escrow agreement with defendant **Kevin Sniffen** and B.M. ("Tyler Mechanical Escrow Agreement"). The Tyler Mechanical Escrow Agreement stated, among other things, that the escrowed funds remained the property of the G.T. and that no other party had an ownership right to the escrowed funds.

56) On or about the following dates, G.T. caused the following deposits to be made into

defendant **Kevin Sniffen**'s Wachovia Escrow account ending in #8685 pursuant to the Tyler Mechanical Escrow Agreement:

| Date | Amount | Payor, Bank & Account No. | Sniffen Escrow Account No. |
|------|--------|---------------------------|----------------------------|
| 4/20/2011 | $320,000.00 | Tyler Mechanical Contracting, LLC PNC Bank acct. # 5906 | Wachovia acct. #8685 |
| 4/22/2011 | $60,000.00 | L.T. BB&T bank acct. #0191 | Wachovia acct. #8685 |

57)     On or about the following dates, defendant **Kevin Sniffen**, P.B., and B.M. caused the Tyler Mechanical escrow funds to be removed from the defendant **Kevin Sniffen**'s Wachovia escrow account ending in #8685 through the following transactions:

| Date | Cashier Check # | Amount | To |
|------|-----------------|--------|-----|
| 4/20/2011 | | $30,000.00 | McCloskey Group LLC Wachovia account #4218 |
| 4/20/2011 | | $3,000.00 | Counter Withdrawal |
| 4/20/2011 | | $92,000.00 | Wired to IAG Underwriters Wells Fargo acct. # 2905 |
| 4/21/2011 | | $4,900.00 | B.M. |
| 4/22/2011 | 1302327051 | $10,000.00 | |
| 4/22/2011 | 1302327050 | $2,500.00 | |
| 4/22/2011 | 1302327053 | $5,000.00 | |
| 4/22/2011 | 1302327054 | $3,000.00 | |
| 4/22/2011 | 1302327052 | $2,000.00 | |
| 4/22/2011 | 1302327048 | $17,000.00 | |
| 4/22/2011 | 1302327049 | $20,000.00 | |

## V.     **T.S. Escrow Fraud**

58)     In or around May and June 2011, T.S. learned that P.B. was seeking a $1.2 million loan in order to show he had proper liquidity to secure a loan from IAG. The $1.2 million would go into an

escrow account. S.N., T.S.'s legal counsel, confirmed with IAG's G.G. that the McCloskey Group could use T.S.'s funds for liquidity purposes. Defendant **Kevin Sniffen** was also required to record a deed on a property in Allentown, PA for the benefit of T.S.

59) On or about June 10, 2011, T.S., acting as the president and owner of Murcielago, LLC, and the defendant **Kevin Sniffen** and B.M. signed an escrow agreement ("Murcielago Escrow Agreement"). The terms of the Murcielago Escrow Agreement stated that the escrowed funds would be held by defendant **Kevin Sniffen** at a Wachovia Bank escrow account for the sole and exclusive benefit of T.S.'s company. The Murcielago Escrow Agreement also stipulated that at the request of T.S. or his representatives, defendant **Kevin Sniffen** would immediately return the escrowed funds to T.S. The Murcielago Escrow Agreement also prohibited defendant **Kevin Sniffen** or anyone else from using the escrowed funds for any other purpose than what was specified in the Murcielago Escrow Agreement.

60) On or about June 13, 2011, pursuant to the terms of the Murcielago Escrow Agreement, T.S. wired $1.2 million to defendant **Kevin Sniffen's** Wachovia escrow account ending in #0766 ("the Murcielago escrow account").

61) From on or about June 14, 2011 to on or about June 16, 2011, defendant **Kevin Sniffen**, P.B. and B.M. caused $1,199,900 to be transferred from the Murcielago escrow account to defendant **Kevin Sniffen's** Wachovia escrow account ending in #8685.

62) On or about the following dates, defendant **Kevin Sniffen**, P.B., and B.M. caused the Murcielago escrow funds to be fraudulently transferred from the defendant **Kevin Sniffen's** Wachovia escrow account ending in #8685:

| Date | Transfer Recipient / Cashier Check # | Amount |
|------|--------------------------------------|--------|
| 6/14/2011 | P.B.'s wife, K.B. | $15,000.00 |
| 6/14/2011 | 1302367472 | $15,000.00 |
| 6/14/2011 | 1302367476 | $100,000.00 |
| 6/14/2011 | Kellen Property | $20,000.00 |
| 6/14/2011 | 1302367478 | $45,000.00 |
| 6/14/2011 | 1302367473 | $20,000.00 |
| 6/14/2011 | 1302367474 | $25,000.00 |
| 6/14/2011 | 1302367475 | $20,000.00 |
| 6/14/2011 | 1302367470 | $160,000.00 |

| | | |
|---|---|---|
| 6/14/2011 | 1302367469 | $90,000.00 |
| 6/14/2011 | 1302367477 | $75,000.00 |
| 6/14/2011 | 1302367486 | $10,000.00 |
| 6/14/2011 | 1302367471 | $4,000.00 |
| 6/14/2011 | McCloskey Group Payroll Wachovia acct. #0419 | $20,000.00 |
| 6/14/2011 | McCloskey Group LLC Wachovia acct. #2284 | $480,000.00 |
| 6/15/2011 | 1302367483 | $20,000.00 |
| 6/15/2011 | McCloskey Group LLC Wachovia acct.#2284 | $20,000.00 |
| 6/16/2011 | 1302367487 | $10,000.00 |

63)     On or about August 1, 2011, T.S.'s associates sent defendant **Kevin Sniffen** a formal written demand requesting the return of $1,350,000 in escrow funds.  From on or about August 1, 2011 through August 12, 2011, defendant **Kevin Sniffen**, as directed by P.B., sent numerous false emails to T.S. and his associates stating that he would pay T.S. his escrow funds back in the near future. Defendant **Kevin Sniffen** never returned T.S.'s escrow funds to him.

I have read this Statement of Facts and carefully reviewed every part of it with my attorney. I understand it, and I voluntarily agree to it. I am completely satisfied with the representation of my attorney.

_2/22/12_
Date

Kevin Sniffen, Esq.

I am Kevin Sniffen's attorney.  I have carefully reviewed this Statement of Facts with him. He advises me that he understands and accepts this Statement of Facts as true and accurate.

_2/22/12_
Date

Joseph Murtha, Esq.